UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOMINIC (AKA DIAMOND) VARGAS,<br>Plaintiff,<br>v.<br>CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, et al.,<br>Defendants. | Case No.: 1:20-cv-000083-JLT-CDB (PC)<br>**FINDINGS AND RECOMMENDATIONS TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br>(Doc. 96)<br>21-Day Objection Period |

Plaintiff Dominic Vargas is proceeding pro se and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983.

## I. INTRODUCTION

On April 13, 2026, Defendants' filed a motion for summary judgment. (Doc. 96.) Following an extension of time, Plaintiff timely filed an opposition (Doc. 103) and Defendants replied (Doc. 108).

## II. SUMMARY OF THE PARTIES' BRIEFING

### *Defendants' Summary Judgment Motion (Doc. 96)*

Defendants contend Plaintiff failed to exhaust his administrative remedies because he did not submit a timely health care appeal concerning gender affirming surgery (GAS) and that his only relevant appeal was received months before his request for GAS had been submitted to the

appropriate committees. The relevant grievance was submitted and decided "before GASRC had acted upon the request for GAS and before SMART had submitted its approval or disapproval of GASRC's submission." Further, Defendants argue Plaintiff did not comply with the applicable regulations relating to grievances because he did not provide the dates concerning his requests for sex reassignment surgery (SRS), the name or position of any involved person (including Defendants), and did not complain that the GAS policy requires transgender prisoners to undergo a different and more onerous process than cisgender incarcerated persons. Defendants assert that because Plaintiff cannot credibly argue he was prevented from filing a timely appeal within 30 days of the denial of his request for GAS, he has failed to exhaust his claims and Defendants are entitled to summary judgment on that basis.

Next, Defendants contend they were not deliberately indifferent to Plaintiff's serious medical needs. They maintain Defendants Mitchell and Neumann had no role in the decisions regarding Plaintiff's requests for GAS and that Defendants Chaiken, Buzzini, and Taylor appropriately acted on Plaintiff's requests given Plaintiff's medical conditions at the time. Therefore, Defendants assert they are entitled to summary judgment on Plaintiff's Eighth Amendment deliberate indifference to serious medical needs claim.

Further, Defendants argue Plaintiff's Fourteenth Amendment claim fails because it is premised on purported class-based discrimination between two classes of patients that are not similarly situated. Specifically, Plaintiff (a transgender man) seeking GAS is not similarly situated to a cisgender incarcerated person who is not being treated for gender dysphoria and is requesting the same surgeries for other medical conditions. Moreover, Defendants maintain CDCR's guidelines pertaining to GAS are not facially discriminatory, the GAS determinations complied with the guidelines and were "based on assessments of Plaintiff's unique conditions and surgical requests at the time" rather than on any policy that treated transgender prisoners seeking GAS differently than cisgender incarcerated persons. Thus, Defendants seek summary judgment in their favor as concerns Plaintiff's Fourteenth Amendment claim.

Defendants also contend that Plaintiff's claims based on Title 15, section 3350.1(c) of the California Code of Regulations are moot because the "former section 3350.1 does not identify

phalloplasty as a surgery 'that is not medically or clinically necessary,'" the current regulation no longer excludes GAS treatment, and Plaintiff was never denied GAS pursuant to that section.

Finally, Defendants argue they are entitled to qualified immunity because it was not clearly established in 2019 and 2020 that denying an incarcerated person's GAS request based on the then relevant guidelines violated the Constitution.

***Plaintiff's Opposition (Doc. 103)***

Plaintiff opposes Defendants' motion, generally asserting he "has provided documented proof that defendants participated in denial of treatment, delay of treatment, and made decisions regarding [his] case with deliberate indifference. This evidence should be allowed a trial by jury."

Next, Plaintiff contends he exhausted his administrative remedies because he filed grievances prior to filing his original complaint on January 16, 2020.

Further, Plaintiff argues Defendants were deliberately indifferent to his serious medical needs. Specifically, Plaintiff contends that while Defendant Neumann may not have treated Plaintiff, Neumann "did oversee those who did," including the "doctor who requested GAS." Plaintiff argues that because "members of GAS and SMART claimed they were uncertain about surgeries impact on [his] mental health, mental health should have clearly documented the request and impact of treatment to their patients."

Next, Plaintiff contends that in "all declarations and reply to Q & A," Defendants "deflected to ruling of committees rather than answer their person[al] contribution to the decision" and therefore a "jury trial is needed to properly examine each" Defendant because each "admitted to personal involvement in the denials/delays" in this case. Plaintiff further asserts that the "reversal of the committees decisions does not negate [Defendants'] culpability of the 2019 denial."

As concerns Plaintiff's Fourteenth Amendment claim, he argues that "'Concepcion v. CDCR' and 'Michelle v. CDCR,'" decided in 2021, "ruled that transgender inmates seeking SRS are similarly situated to cisgender inmates," and that both referred to "Harrison v. Kernan … as the standard," contradicting Defendants' argument.

Plaintiff maintains that while section 3350.1 "may have changed," his claim "is still valid

because its that defendants refuse to follow policy," stating that from 2019 through present, Defendants have "made decisions that violated existing policy and violated [his] civil rights."

Lastly, as concerns Defendants' assertion they are entitled to qualified immunity, Plaintiff states that each "acted with [autonomy] and agency to make decisions regarding" his care and thus Defendants "are not immune and a jury should hear the case in full."

***Defendants' Reply (Doc. 108)***

Defendants contend Plaintiff has failed to comply with this Court's Local Rules because he failed to reproduce Defendants' itemized facts or identify which, if any, he disputed. Moreover, Defendants argue Plaintiff failed to submit proof concerning the exhaustion of his administrative remedies, his opposition fails to cite to admissible evidence, and Plaintiff's opinions and inadmissible hearsay are improper. Finally, Defendants contend Plaintiff failed to provide "any authenticated facts" establishing a genuine issue of material fact in dispute.

Defendants argue Plaintiff's citations in the opposition, offered in support of his Fourteenth Amendment claim, do not invalidate Macomber's argument because Defendants do not dispute the applicable standard of review and the *Concepcion* case involved a determination of a motion to dismiss where the guidelines for review of GAS were not an issue in that decision. Defendants maintain Plaintiff has failed to cite to authority disproving the relevant guidelines were created for the purpose of providing equitable access to healthcare for transgender inmates and that the decisions made in this action were proper, entitling Macomber to summary judgment.

Next, Defendants contend that Plaintiff's argument his section 3350.1 is not moot is unavailing because Plaintiff failed to produce any evidence that Defendant Macomber failed to follow, or violated, existing policies.

Finally, Defendants argue that Plaintiff's assertions regarding qualified immunity are immaterial and unrelated to whether their conduct violated clearly established statutory or constitutional rights and that Plaintiff failed to submit any evidence that Defendants Chaiken, Taylor, and Buzzini's initial denial of Plaintiff's "GAS request was not appropriately based on their contemporaneous assessment of his medical conditions in accordance with existing CDCR policy" and that Plaintiff did not dispute that Defendants Mitchell and Neumann played no role in

the GAS decisions. Hence, Defendants maintain they are entitled to qualified immunity.

## III. APPLICABLE LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials...." Fed. R. Civ. P. 56(c)(1)(A).

Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of their pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists or shows that the materials cited by the movant do not establish the absence of a genuine dispute. *See* Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Further, the opposing party must also demonstrate that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See*

*Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987). In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *See Matsushita*, 475 U.S. at 587. Nevertheless, inferences are not drawn out of "this air," and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted)

**B. Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion of administrative remedies is mandatory and "unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). Inmates are required to "complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). The exhaustion requirement applies to all inmate suits relating to prison life, *Porter v. Nussle*, 534 U.S. 516, 532 (2002), regardless of the relief sought by the prisoner or offered by the administrative process, *Booth v. Churner*, 532

U.S. 731, 741 (2001).

The failure to exhaust administrative remedies is an affirmative defense, which the defendant must plead and prove. *Jones*, 549 U.S. at 204, 216. The defendant bears the burden of producing evidence that proves a failure to exhaust; and, summary judgment is appropriate only if the undisputed evidence, viewed in the light most favorable to the plaintiff, shows the plaintiff failed to exhaust. *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014).

On a motion for summary judgment, the defendant must prove (1) the existence of an available administrative remedy and (2) that the plaintiff failed to exhaust that remedy. *Albino,* 747 F.3d at 1172 (citation omitted). If the defendant meets this burden, the plaintiff then "has the burden of production. That is, the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* (citation omitted). "However, … the ultimate burden of proof remains with the defendant." *Id.*

An inmate "need not exhaust unavailable [remedies]." *Ross v. Blake*, 578 U.S. 632, 642 (2016). An administrative remedy is unavailable "when (despite what regulations or guidance materials may promise) it operates as a simple dead end with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; or when "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use, [i.e.,] some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate [the mechanism]"; or "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 643-44.

When the district court concludes that the prisoner has not exhausted administrative remedies on a claim, "the proper remedy is dismissal of the claim without prejudice." *Wyatt v. Terhune*, 315 F.3d 1108, 1120 (9th Cir. 2003) (citation omitted), *overruled on other grounds* by *Albino*, 747 F.3d at 1168-69. "If a motion for summary judgment is denied, disputed factual questions relevant to exhaustion should be decided by the judge." *Albino*, 747 F.3d at 1170. If the court finds that remedies were not available, the prisoner exhausted available remedies, or the failure to exhaust available remedies should be excused, the case proceeds to the merits. *Id*. at

1171.

**C. CDCR Grievance Process**

The California Department of Corrections and Rehabilitation (CDCR) has an administrative grievance system for prisoners to appeal a policy, decision, action, condition, or omission by the department or staff if it has an adverse effect on prisoner health, safety, or welfare. Cal. Code Regs. tit. 15, §§ 3084.1(a) (2018), 3999.226(a). Compliance with 42 U.S.C. § 1997e(a) requires California-state prisoners to use CDCR's grievance process to exhaust their claims prior to filing suit in court. *See Sapp v. Kimbrell*, 623 F.3d 813, 818 (9th Cir. 2010); *see also Woodford*, 548 U.S. at 85-86. Administrative appeals are generally subject to two to three levels of review before the remedy is deemed exhausted. Cal. Code Regs. tit. 15, §§ 3084.1(b) (2018), 3084.7(d)(3) (2018), 3999.226(g), 3999.230(h); *see Sapp*, 623 F.3d at 818.

**D. Eighth Amendment Deliberate Indifference to Serious Medical Needs**

Prison officials violate the Eighth Amendment if they are "deliberate[ly] indifferen[t] to [a prisoner's] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "A medical need is serious if failure to treat it will result in '"significant injury or the unnecessary and wanton infliction of pain."'" *Peralta v. Dillard*, 744 F.3d 1076, 1081-82 (9th Cir. 2014) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)).

To maintain an Eighth Amendment claim based on medical care in prison, a plaintiff must first "show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendants' response to the need was deliberately indifferent." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (quoting *Jett*, 439 F.3d at 1096 (quotation marks omitted)).

As to the first prong, indications of a serious medical need "include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily

activities; or the existence of chronic and substantial pain." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (citation & internal quotation marks omitted); accord *Wilhelm*, 680 F.3d at 1122; *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) ("Examples of serious medical needs include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain").

As to the second prong, deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). Deliberate indifference is shown where a prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. In medical cases, this requires showing: (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. *Wilhelm*, 680 F.3d at 1122 (quoting *Jett*, 439 F.3d at 1096). "A prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." *Jett*, 439 F.3d at 1096, citing *McGuckin*, 974 F.2d at 1060).

Deliberate indifference is a high legal standard. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Id.* at 1057 (quoting *Farmer*, 511 U.S. at 837). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" *Id.* (quoting *Gibson v. County of Washoe, Nevada,* 290 F.3d 1175, 1188 (9th Cir. 2002)).

To prevail on a deliberate-indifference claim, a plaintiff must also show that harm resulted from a defendant's wrongful conduct. *Wilhelm*, 680 F.3d at 1122; *see Jett*, 439 F.3d at 1096; *Hallett v. Morgan*, 296 F.3d 732, 746 (9th Cir. 2002) (prisoner alleging deliberate indifference based on delay in treatment must show delay led to further injury).

**E. Fourteenth Amendment Equal Protection**

The Equal Protection Clause requires that all persons who are similarly situated should be treated alike. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985); *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001). To state an Equal Protection claim, a plaintiff must show that the defendants acted with an intent or purpose to discriminate against him based on membership in a protected class, *Lee*, 250 F.3d at 686; *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998), cert. denied, 525 U.S. 1154 (1999), or that similarly situated individuals were intentionally treated differently without a rational relationship to a legitimate state purpose, *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005).

## IV. DEFENDANTS' STATEMENT OF UNDISPUTED FACTS ("UDF")

**Plaintiff, Defendants, and Background**

1. Plaintiff Dominic Vargas aka Diamond Vargas (Vargas) is a transgender male who is in the custody of the California Department of Corrections (CDCR) and incarcerated at all times to the complaint at the Central California Women's Facility (CCWF).
2. Vargas suffers from gender dysphoria and alleges that Defendants S. Neumann, L. Taylor, S. Chaiken, T. Buzzini, and R. Mitchell, in their individual capacity, unlawfully denied him medically necessary gender affirming surgery in violation of the Eighth Amendment.
3. Vargas asserts that Secretary Macomber, in his official capacity, violated the Fourteenth Amendment by instituting policies that require transgender inmates to undergo a more onerous review process than cisgender inmates for obtaining medically necessary surgeries.
4. At all times relevant to the complaint, Defendant Dr. R. Mitchell was employed by CDCR as the Chief Medical Executive at CCWF. Dr. Mitchell performed the required primary care evaluation of Vargas on July 25, 2019, but he had no decision making role in Vargas's requests for Gender Affirming Surgery (GAS).
5. At all times relevant to the complaint, Defendant Dr. S. Neumann was the Chief of

Mental Health for CDCR at CCWF. Dr. Neumann never provided any treatment to Vargas, and she had no decision making role in Vargas's request for GAS.

6. At all times relevant to the complaint, Defendant Dr. L. Taylor was the Deputy Medical Executive for Clinical Operations with CDCR and the Chair of the Statewide Medical Authorization Review Team (SMART) Committee.

7. At all times relevant to the complaint, Defendant Dr. S. Chaiken was a Chief Psychologist for CDCR and the Chair of the Gender Affirming Surgery Review Committee (GASRC) from January 2019 approximately January 2021, and a member of GASRC until her retirement on November 2, 2021.

8. At all times relevant to the complaint, Defendant Dr. T. Buzzini was the Senior Psychologist Specialist, Inpatient Referral Unit, Statewide Mental Health Program, and member of GASRC.

9. Defendant Macomber has been the Secretary of CDCR from December 12, 2022 to present.

**Guidelines for Requests for Gender Affirming Surgery and Plaintiff's Requests**

10. In December 2018, CCHCS issued a Supplement to CCHCS/DHCS Care Guide related to Gender Dysphoria [or "GD"], specifically Guidelines for Review of Requests for Gender Affirming Surgery. These Guidelines provided that in accordance with California Code of Regulations Title 15, Section 3999.200, transgender patients meeting basic prerequisite criteria as established by California Correctional Health Care Services may request GAS, which shall be referred to SMART. SMART shall forward the request to the GASRC, a subcommittee of SMART, to evaluate and consider possible GAS consistent with the Guidelines. These Guidelines were in effect from December 2018 to July 2021.

11. Pursuant to the Guidelines for Review of Requests for Gender Affirming Surgery, upon receipt of Vargas's request[1] for GAS, CCWF submitted Vargas's Request for

---

[1] As set forth in UDF 13 (*infra*), Vargas's request was received on August 16, 2019.

Services to SMART, who then forwards the request to GASRC, a subcommittee of SMART. GASRC then evaluates and considers possible surgery consistent with the Guidelines. The Committee shall determine whether the patient is an appropriate candidate for Surgery from a medical and mental health perspective, following consideration of the following applicable factors and report their recommendation to SMART: 1) The patient has been diagnosed with GD by a Division of Correctional Health Care Services (DHCS) mental health provider and the diagnosis is supported with appropriate documentation and clinical justification as set forth by CCHCS policies and care guidelines. 2) The efficacy of the current treatment for GD being offered and received to ameliorate the patient's GD from both a medical and mental health perspective. 3) Whether other treatments besides Surgery should be considered for addition to the existing treatment regimen. 4) The patient has no current mental health or medical contraindications that would preclude any further consideration of the request for Surgery until they are resolved or mitigated. 5) Any known medical and/or co-existing mental health concerns have been fully assessed and have been well-controlled for at least one year; do not pose a contraindication to Surgery; and are not likely to worsen with Surgery or impede surgical recovery. 6) The patient has: a) Continuously manifested a desire to live and to be accepted as a member of the preferred sex, including the desire to make his/her body as congruent as possible with the preferred sex, for at least two years; b) Lived full-time in his/her desired gender role for at least 12 months, as permitted in the correctional environment, and has received at least 12 continuous months of medically supervised hormone therapy appropriate to his/her gender goals (unless there was a medical contraindication to this therapy). 7) The patient is in significant distress due to lack of reasonable response to available nonsurgical treatment of gender dysphoria. The patient's gender dysphoria symptoms cannot be attributed to the conditions of confinement, mental illness or any other factor; and there are no available, additional treatments other than Surgery that are likely to improve or alleviate the patient's symptoms. 8) The patient has been

provided with necessary and relevant information to enable him/her to understand that his/her environment will be evaluated after Surgery and any new environment may be unfamiliar and pose significant adaptive challenges. The patient understands that appropriate postoperative placement will be reviewed on a case-by-case basis by CDCR custody staff. 9) The patient can be expected to successfully and safely transfer and adjust medically and psychologically to confinement postoperatively. 10) There is no evidence suggestive of any external coercion or predation and the desire for Surgery is freely given by the patient. 11) Any other information available which may be relevant to their discussion or determination.

12. Upon receipt of the Committee's report of findings by SMART, that Team would meet to consider the report and any other information relevant to their determination. Pursuant to the Guidelines, SMART shall afford great weight to the decision of the GASRC and shall only reverse the decision when they find that 1) there is no substantial evidence to support the decision of the Committee; or 2) the Committee based their decision on erroneous facts; or 3) the Committee failed to consider significant relevant information bearing on the case in reaching their decision, or new evidence from credible and reliable sources has come to the attention of SMART which was not available to the Committee at the time of their decision.

13. On August 16, 2019, a Request for Services (RFS) was submitted for Vargas requesting he be considered for (GAS), specifically bilateral reduction mammoplasty, hysterectomy, salpingooophorectomy, and procedures for phalloplasty, to include urethroplasty, scrotoplasty, and placement of testicular prostheses.

14. On October 29, 2019, GASRC provided a recommendation to the Statewide Medical Authorization Review Team that Vargas's request for GAS be denied due to his mental health status. In April 2019, Vargas was diagnosed with Bipolar Disorder Not Otherwise Specified (NOS), and in September 2019 he was described as manic and refusing further medications. GASRC believed these mental health concerns possibly posed a contraindication to surgery.

15. On November 19, 2019, Dr. Taylor and the other members of SMART found there was no substantial evidence to not support the decisions of the Committee denying Vargas' request for GAS.

16. On October 26, 2020, a second RFS was submitted for Vargas requesting he be considered for GAS, specifically bilateral reduction mammoplasty, hysterectomy, salpingooophorectomy, and procedures for phalloplasty, to include urethroplasty, scrotoplasty, and placement of testicular prostheses.

17. On December 29, 2020, GASRC provided a recommendation to SMART that reduction mammoplasty be approved and masculinizing bottom surgeries not be approved until Vargas's medical and mental health conditions were fully assessed and well-controlled for at least one year. The Committee noted Plaintiff suffers from chronic kidney disease stage 3, which had not been further evaluated, and that the primary care provider would be ordering a renal ultrasound as well as a nephrology eConsult. The Committee further noted Plaintiff's mood lability had improved in the past year, but he continued to demonstrate intermittent mood symptoms and disruptive behavior and has declined medications that may help stabilize his mood. The Committee concluded there was evidence that suggested Plaintiff did not have the ability to adjust medically and psychologically to his new environment postoperatively, including complying with medical and mental health interventions, as he had a history of declining psychotropic medications. The inherent risk of each procedure is assessed and approved independently, and top surgery has much less risk than bottom surgery.

18. On January 5, 2021, SMART reviewed GASRC's recommended action of "Approved" for Mr. Vargas's request for mammoplasty and any related chest surgery, and "Not Approved" for Mr. Vargas's request for any lower body surgery until medical and mental health conditions have been fully assessed and well controlled for at least one year. SMART found there was no substantial evidence to reverse the decision of the Committee and approved the recommended action by the Committee.

19. On October 3, 2022, masculinizing mammoplasty surgery was performed.

20. On April 20, 2022, another RFS was submitted for Vargas for hysterectomy, salpingo-oophorectomy, phalloplasty, urethroplasty, scrotoplasty, and placement of testicular prostheses.

21. On November 23, 2022, SMART did not find any significant potential medical contraindications to GAS, specifically masculinizing bottom surgery (phalloplasty, vaginectomy, hysterectomy, salpingooophorectomy, urethroplasty, scrotoplasty, and placement of testicular prostheses).

22. On June 6, 2023, GASRC found there was no substantial evidence to reverse the decision of SMART and approved GAS, and masculinizing bottom surgery.

23. In preparation for a phalloplasty, Vargas underwent a total hysterectomy and bilateral salpingo-oophorectomy with no complications on July 8, 2024.

24. Beginning in August 2024, Vargas began the process of hair removal of thigh needed before phalloplasty can be performed. During an August 13, 2024, consultation with Dr. Michael Safir, Vargas, in consultation with his physician, changed the donor site for his phalloplasty to his forearm, and in December 2024, he began electrolysis to his forearm. Electrolysis is ongoing.

25. On September 12, 2024, Vargas underwent bilateral chest scar revision and bilateral nipple-areolar reconstruction.

26. On October 18, 2024, another RFS was submitted for Vargas for masculinizing body contouring and facial masculinization. On November 26, 2024, GASRC did not find any significant potential medical contraindications to masculinizing body contouring and facial masculinization and approved them.

27. On July 11, 2025, Vargas had a consultation with Angela Rodriguez, M.D. of ART Surgical regarding facial masculinization. Dr. Rodriguez determined Vargas was not a candidate for facial masculinization, because he already has a masculine face.

28. On March 23, 2026, Vargas underwent an abdominal ultrasound examination, which revealed a fat-containing supraumbilical ventral hernia. Vargas is in the process of

being scheduled for a follow-up visit with Dr. Rodriguez to determine if hernia repair is necessary prior to masculinizing body contouring.

29. Vargas is [at the time of Defendants' filing] scheduled for phalloplasty surgery on July 1, 2026, with Michael Safir, M.D. of Align Surgical Associates, San Francisco.

30. Vargas acknowledges that phalloplasty and masculinizing body contouring represents the final remaining steps in his gender affirming surgical transition.

**Healthcare Appeals**

31. CDCR, through the Health Care Correspondence and Appeals Branch (HCCAB), and CCWF had an administrative grievance process for inmates at all times relevant to this lawsuit, which allows them to appeal any medical, dental, and mental health care grievances for adult inmates in CDCR.

32. Commencing on September 1, 2017, California Code of Regulations (CCR), Title 15, §§ 3999.225 – 3999.237 governs the health care grievance process. Under these regulations, incarcerated persons may grieve issues regarding health care policies, decisions, actions, conditions, or omissions using a CDCR 602 HC, Health Care Grievance form. Cal. Code Regs. tit. 15, §§ 3999.226, 3999.227(a) (2019). Health care grievances are subject to two levels of review: health care grievances are processed at the institutional level by Health Care Grievance Offices at each institution and health care grievance appeals are processed at the headquarters level by the HCCAB, if requested by the incarcerated person. Cal. Code Regs. tit. 15, § 3999.226(a)(1) (2019). Health care grievances are subject to a headquarters disposition before administrative remedies are deemed exhausted. Cal. Code Regs. tit. 15, § 3999.226(g) (2019). These regulations were originally enacted on September 1, 2017, under § 3087; however, in 2019 the section numbering was changed without regulatory effect.

33. Health care grievances are tracked and maintained in an electronic database known as the Health Care Appeals and Risk Tracking System (HCARTS).

34. Between the years April 1, 2019 and April 19, 2023, the date of Plaintiff's operative third amended complaint, Plaintiff submitted nine health care grievances, two of

which pertained to his requests for GAS.

35. The first potentially relevant health care [appeal] was assigned Tracking number CCWF HC 19000205 and was received at the institutional level on April 2, 2019. The Plaintiff's stated issues included: deliberate indifference towards medical needs for physical therapy and lidocaine gel, and delayed receipt of his testosterone shot. This grievance was accepted for processing. The Plaintiff was issued an Institutional Level Response dated June 3, 2019, with a disposition of No Intervention. The grievance was received for headquarters level review on July 3, 2019. The Plaintiff was issued a Headquarters Level Response dated September 19, 2019, with a disposition of No Intervention.

36. The second potentially relevant health care [appeal] was assigned Tracking number CCWF HC 19000365 and was received at the institutional level on May 21, 2019. The Plaintiff's stated issues included: being denied SRS surgery and wanted to be scheduled immediately. This grievance was accepted for processing. The Plaintiff was issued an Institutional Level Response dated July 25, 2019, with a disposition of Intervention. The Plaintiff was informed that management of gender dysphoria is a multidisciplinary effort, and that Plaintiff's provider submitted a CDC 7243, Health Care Services Physician Request for Services for GAS to the Institutional Utilization Management Committee. The Plaintiff was informed that the Committee would review the request and subsequently refer it to the Headquarters Utilization Management Committee for evaluation and consideration for possible GAS in accordance with the Guidelines for Review of Requests for GAS, Supplement to the CCHCS/DHCS Care Guide: Gender Dysphoria. The grievance was received for headquarters level review on August 8, 2019. The Plaintiff was issued a Headquarters Level Response dated October 29, 2019, with a disposition of No Intervention.

37. Plaintiff submitted seven additional health care grievances that are unrelated to Plaintiff's requests for GAS during the time period April 1, 2019 to April 19, 2023.

(Doc. 96-2.)

## V. EVIDENTIARY MATTERS

Plaintiff has failed to properly respond to Defendants' Statements of Undisputed Facts in support of the motion for summary judgment. Plaintiff was served with a *Rand* warning specifically referencing Rule 56 requirements and this Court's Local Rules requirements pertaining to opposing a motion for summary judgment. (*See* Doc. 96-3.) Plaintiff neither reproduced Defendants' itemized facts, nor admitted or denied those facts. Because Plaintiff has not complied with Local Rule 260(b), the Court deems Plaintiff to have admitted those facts. *See, e.g.*, *Beard v. Banks*, 548 U.S. 521, 527 (2006) ("by failing specifically to challenge the facts identified in the defendant's statement of undisputed facts, [plaintiff] is deemed to have admitted the validity of the facts contained in the [defendant's] statement."); *Brito v. Barr*, No. 2:18-cv-00097-KJM-DB, 2020 WL 4003824, at *6 (E.D. Cal. July 15, 2020) (deeming defendant's undisputed facts as admitted after plaintiff failed to comply with Local Rule 260(b). Nevertheless, where Plaintiff's verified complaint or evidence submitted in support of his opposition to Defendants' motion for summary judgment bring Defendants' proffered facts into dispute, the Court considered the complaint and any evidence. *Jones v. Blanas,* 393 F.3d 918, 923 (9th Cir. 2004) (the court considers as evidence those parts of the verified complaint based on plaintiff's personal knowledge).

## VI. THE FACTUAL ALLEGATIONS & SCREENING FINDINGS

The Court summarized Plaintiff's factual allegations, asserted in his second amended complaint, as follows:

> Plaintiff is a state inmate housed at Central California Women's Facility ("CCWF") in Chowchilla, California. Plaintiff contends that Defendants unlawfully denied him access to medically necessary SRS. Plaintiff asserts Eighth Amendment medical indifference claims and a Fourteenth Amendment equal protection claim against employees of the California Department of Corrections and Rehabilitation ("CDCR"). These individuals are identified and described by Plaintiff as follows:
>
> (1) Jeff Macomber, Secretary of CDCR, "had ultimate responsibility and authority for the operation of CDCR, including the administration of health care and implementation of medical care policies governing CDCR, including the administration of health care and implementation of medical care policies governing CDCR." (Doc. 20 at 3.)

(2) Leslie Taylor, Deputy Medical Executive of clinical operations, who "served as the chair of the Statewide Medical Authorization Review Team ("SMART") and Gender Affirming Surgery Review Committee (GASRC)" and announced the final denial of Plaintiff's SRS request. (*Id.* at 3–4.)

(3) Robert Mitchell, Chief Medical Executive of CCWF, who also announced the denial of Plaintiff's SRS request and had "ultimate authority" over Plaintiff's request for SRS. (*Id.* at 4).

(4) Stephanie Neumann, Chief of Mental Health, "believed to be a member of the SMART Committee." (*Id.* at 4–7.)

(5) Tristan Buzzini, Sr. Psychologist, "believed to be a member of the SMART Committee." (*Id.* at 7.)

(6) Molli Rudich, "utilization management and believed to be a member of the SMART Committee." (*Id.*)

(7) Shama Chaiken, doctor on the SMART Committee.

Plaintiff sues each defendant in his or her official and individual capacities. Plaintiff alleges that, "as members of the SMART and GASRC, these defendants had the authority to grant or deny Plaintiff's access to gender transition surgeries and are responsible for denying Plaintiff access to medically necessary care . . .." (*Id.*)

Plaintiff is a transgender man and suffers from severe gender dysphoria. Plaintiff was born in Puerto Rico and named Shirley Vargas. Plaintiff describes a violent, abusive childhood, with a mother who beat him over his love of sports and masculinity; ridiculed and humiliated him; and dressed him in dresses and forced him to be a model. Plaintiff left home when he was fifteen years old, changed his name to Diamond Vargas, and became a "male impersonator." He has worked and lived as a man since the late 1980s and early 1990s. Plaintiff has presented himself as a man while in custody of CDCR. When he was diagnosed with gender dysphoria in 2017, Plaintiff's doctors determined it was medically necessary for him to receive treatment for his condition, and he began hormone replacement therapy in the form of testosterone injections. (Doc. 20 at 9.) Plaintiff alleges that the treatment has worsened his gender dysphoria because of side effects including increased breast size and the re-onset of menses.

Plaintiff reported to his treating providers multiple times that the hormone regimen was not adequately reducing his symptoms of gender dysphoria. In 2018, Plaintiff asked his primary care physician, Dr. Gonzales, to be considered for SRS. Dr. Gonzales confirmed his eligibility for SRS and submitted a Physician Request for Services for SRS. Dr. Chris S. Glass, Plaintiff's treating psychologist, completed and submitted a CDCR evaluation for consideration for SRS. Defendant "Leslie Taylor along with the SMART and the GASRC" denied Plaintiff's request for SRS, finding that the SRS was not medically necessary and that the current treatment provided significant, adequate, and sufficient relief.

> Plaintiff asserts that leading medical research and well-established and widely accepted medical standards of care recognize that SRS is a medically necessary treatment for severe cases of gender dysphoria. Therefore, Plaintiff asserts that the failure to recognize and affirm Plaintiff's male gender identity "evidences the incompetence" regarding Plaintiff's and illustrates deliberate indifference by Defendants to Plaintiff's serious medical condition. Plaintiff further argues that Defendants' failure to grant Plaintiff's request for SRS was unreasonable and manifested a wanton disregard for appropriate treatment of Plaintiff's gender dysphoria. Additionally, Defendants failed to take reasonable measures to address Plaintiff's ongoing mental anguish. The denial of SRS has caused irreparable harm. Plaintiff continues to suffer from severe anxiety, depression, and distress caused by his gender dysphoria, and he struggles with suicidal ideations.
>
> Plaintiff argues in his first claim that the Defendants' denial of a medically necessary surgery amounts to cruel and unusual punishment in violation of the Eight[h] Amendment.
>
> In his second claim, Plaintiff alleges that each Defendant violated the [Equal Protection] clause of the Fourteenth Amendment and applied a policy of disparate treatment based on gender or transgender status. Plaintiff asserts that the temporary amendments to California Code of Regulations title 15, section 3350.1(c) categorically excludes SRS. Other exclusions require a specific procedure to determine if a treatment exclusion may be medically necessary for a specific individual.
>
> CDCR policy requires transgender prisoners seeking SRS for gender dysphoria to undergo a different and more onerous process than cisgender inmates seeking SRS. Plaintiff thus alleges that the regulatory scheme is facially discriminatory against transgender and noncisgender prisoners because medically necessary surgeries are unavailable to them, while cisgender prisoners can receive the same medically necessary procedures, e.g., bilateral mastectomy, hysterectomy, salpingo-oophorectomy, phalloplasty, urethroplasty, scrotoplasty, and testicular prostheses. Plaintiff asserts that the disparity in treatment does not further any important government interest, nor is it rationally related to any legitimate government interest. Plaintiff argues that, by failing to provide SRS to Plaintiff while incarcerated, Defendants have deprived Plaintiff of his right to equal protection under the laws guaranteed by the Fourteenth Amendment.

(*See* Doc. 30 at 4-7, fns. omitted.) The Court applied the relevant legal standards at screening and found as follows:

> In this case, Plaintiff asserts that he suffers from a serious medical need for treatment of his gender dysphoria, which is "[d]istress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics)." *Edmo v. Corizon,*

> *Inc.*, 935 F.3d 757, 769 (9th Cir. 2019), cert. denied sub nom. *Idaho Dep't of Corr. v. Edmo*, 141 S. Ct. 610 (2020) (quoting World Prof'l Ass'n for Transgender Health, Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People 2 (7th ed. 2011)). The Ninth Circuit has recognized that "[g]ender dysphoria is a serious but treatable medical condition." *Edmo*, 935 F.3d at 769. Left untreated, gender dysphoria may cause debilitating distress and depression, and may lead to self-injurious behavior, including suicide. *Id*. While some individuals with gender dysphoria can be treated without surgery, for others surgery is medically necessary to alleviate their gender dysphoria. *Id*. at 771. The accepted standard of care requires providers to diagnose, assess, and treat gender dysphoria on an individual bases. *Id*. "Failure to follow an appropriate treatment plan can expose transgender individuals to a serious risk of psychological and physical harm." *Id*.
>
> For pleading purposes, Plaintiff has sufficiently satisfied both prongs of a claim for medical indifference. Plaintiff's severe gender dysphoria presents a serious medical need. He has urged that hormone therapy treatment is ineffective for treating his gender dysphoria and has worsened his condition because of side effects, causing him psychological harm to the point of having suicidal ideations. Plaintiff has alleged that Defendant Robert Mitchell and Defendants on the SMART Committee were deliberately indifferent to his serious medical need by denying his request for SRS, particularly in light of his treating physicians' opinions that SRS surgery was medically necessary.
>
> Construing the SAC liberally, Plaintiff's allegations raise a cognizable claim for medical indifference under the Eighth Amendment.
>
> [¶]-[¶]
>
> Plaintiff asserts that he is being treated differently based on transgender status. Plaintiff complains that the 2016 SRS guidelines prevents transgender prisoners from receiving medically necessary surgeries and prohibits treating physicians from opining about the necessity of SRS surgery for a prisoner. According to Plaintiff's arguments, transgender inmates must undergo a more onerous review process than cisgender inmates for obtaining medically necessary surgeries such as bilateral mastectomy, hysterectomy, salpingo-oophorectomy, etc. Such procedures are readily available for cisgender inmates but are not similarly available for inmates with gender dysphoria. Such disparate treatment, Plaintiff argues, deprives him of equal protection under the Fourteenth Amendment.
>
> Affording a liberal construction to the SAC, Plaintiff states a cognizable [equal protection] claim against Defendant Macomber, the only Defendant with authority to implement CDCR policy and subject to injunctive relief.

(*Id*. at 10-12.) The Court also addressed official versus individual capacity claims (*id*. at 7), injunctive and declaratory relief (*id*. at 12-13) and concluded:

> Plaintiff's second amended complaint raises a Fourteenth Amendment [equal protection] claim against CDCR Secretary Jeff Macomber. As to Defendants Leslie Taylor, Robert Mitchell, Stephanie Neumann, Tristan Buzzini, Molli Rudich, and Shama Chaiken, the second amended complaint fails to state a claim on which relief may be granted. The Court will grant Plaintiff an opportunity to file a third amended complaint. *See Lucas v. Dep't of Corr.*, 66 F.3d 245, 248 (9th Cir. 1995). If Plaintiff does not wish to amend, he may instead file a notice of voluntary dismissal, and the action will be terminated by operation of law. Fed. R. Civ. P. 41(a)(1)(A)(i). Alternatively, Plaintiff may forego amendment and notify the Court that he wishes to stand on his complaint. *See Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1064–65 (9th Cir. 2004). If the last option is chosen, the Court will issue findings and recommendations to dismiss the complaint without leave to amend, Plaintiff will have an opportunity to object, and the matter will be decided by a district judge.

(*Id.* at 13.) Plaintiff was directed to respond within 30 days. (*Id.* at 14.)

Following submission of Plaintiff's third amended complaint (Doc. 33), the Court issued Findings and Recommendations. (Doc. 34.) More specifically, it construed Plaintiff's response to the screening order "as an affirmation that he wishes to stand on his second amended complaint as screened and to dismiss Mollie Rudich …." (*Id.* at 2.) Thus, the undersigned recommended the action proceed on Plaintiff's Eighth Amendment medical indifference claims (Claim I) against Defendants Leslie Taylor, Robert Mitchell, Stephanie Neumann, Tristan Buzzini, and Shama Chaiken, and on his Fourteenth Amendment claim (Claim II) against Defendant Jeff Macomber, that Defendant Rudich be dismissed, that Claim II be dismissed as to all other Defendants, and that his claim for injunctive relief in connection with Claim I and declaratory judgment be stricken. (*Id.*) Thereafter, without objection, the Findings and Recommendations were adopted in full by the presiding district judge. (Doc. 35.)

///

///

///

///

///

///

## VII. DISCUSSION[2]

### A. Plaintiff Failed to Exhaust Administrative Remedies

This Court must determine whether Plaintiff exhausted his administrative remedies regarding his Eighth Amendment deliberate indifference claim or CDCR's policy for transgender inmates seeking GAS. To be clear, the merits of Plaintiff's claims are not addressed in a challenge pertaining to the administrative exhaustion requirements. This portion of Defendants' summary judgment motion concerns the exhaustion of administrative remedies only, and thus, considers only "evidence concerning [Plaintiff's] inmate appeals, the availability and exhaustion of remedies, and the sufficiency of the information provided in the grievances to give defendants notice of the claims raised against each of them in this lawsuit." *Williams v. Thompson*, No. 1:19-cv-00330-AWI-CDB (PC), 2023 WL 2823388, at *1 (E.D. Cal. Apr. 7, 2023) (adopting findings and recommendations to grant defendants' motion for summary judgment on exhaustion grounds).

Defendants have met their initial burden by demonstrating Plaintiff did not submit a timely grievance/appeal concerning Defendants' alleged deliberate indifference in denying Plaintiff's request for GAS or regarding CDCR's policy for transgender inmates who seek GAS. Specifically, Defendants' evidence indicates that only two grievances —HC 19000365 & HC 19000205— relate to the denial of GAS. UDF 35, 36. The latter concerned physical therapy, lidocaine gel and delay pertaining to a testosterone shot; the former concerned the denial of SRS and a request to schedule surgery immediately. *Id*. None of the remaining seven health care grievances submitted during the relevant period relate to GAS. UDF 37.

Relevant here, HC 19000365 was received at the institutional level on May 21, 2019. UDF 36. Plaintiff explained his issue: "I am a female to male inmate requesting SRS surgery and being denied repeatedly. I have a constitutional right to access to adequate medically necessary

[2] In arriving at these findings and recommendations, the undersigned carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that the undersigned did not consider the argument, document, paper, or objection. The undersigned thoroughly reviewed and considered the evidence deemed admissible, material, and appropriate.

medical care." (*See* Doc. 96-11 at 48.) He requested SRS surgery immediately and noted he met all requirements. *Id*. The institutional response is dated July 25, 2019, and indicates that Plaintiff's provider "submitted a CDC 7243, Health Care Services Physician Request for Services" on July 24, 2019, and that the request would be reviewed by the "Institutional Utilization Management Committee" and thereafter by the "Headquarters Utilization Management Committee …." UDF 36; Doc. 96-11 at 50. Plaintiff appealed and the headquarters level response from the HCCAB states that a "mental health clinical evaluation" was conducted on September 5, 2019 and was to "be forwarded to Utilization Management for submission to the Statewide Medical Authorization Review team …." UDF 36; Doc. 96-11 at 44.

Moreover, none of the grievances submitted by Plaintiff during the relevant period concern his allegation that CDCR's policy resulted in disparate treatment based on transgender status. UDF 37; *see* Doc. 96-11 at 8-24, 56-63, 65-76, 78-82, 84-91, 93-114, 116-126, 128-138.

The relevant grievance was submitted and adjudicated, as Defendants assert, "before GASRC had acted upon the request for GAS and before SMART had submitted its approval or disapproval of GASRC's submission." As Defendants correctly state, "Plaintiff's grievance would not have placed prison authorities on notice of the specific claims raised in this lawsuit" because the grievance does not complain about GASRC and SMART's denial of Plaintiff's request for GAS or CDCR's alleged policy of disparate treatment based on transgender status. *Jones*, 549 U.S. at 211; *Woodford*, 548 U.S. at 88, 93. Thus, Defendants have met their initial burden of establishing that Plaintiff failed to exhaust his administrative remedies concerning his medical indifference claim and any complaint concerning CDCR policy that results in disparate treatment of transgender inmates. *Albino,* 747 F.3d at 1166, 1172. The burden now shifts to Plaintiff to "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.*

Plaintiff fails to meet his burden of production. First, Plaintiff does not argue or produce any evidence that the administrative grievance process was unavailable to him. *Ross*, 578 U.S. at 642-644. Next, because Plaintiff neither admitted nor denied Defendants' UDFs, those facts are

deemed admitted. *Beard*, 548 U.S. at 527. Nevertheless, the Court considers whether a genuine dispute of material facts is presented in the factual allegations of Plaintiff's second and third amended complaints. *Jones*, 393 F.3d at 923.

In both his second and third amended complaints, Plaintiff asserted there was an administrative remedy process available at his institution, that he filed an appeal or grievance concerning all the facts alleged in the complaint, and that he completed the process. (Doc. 20 at 2 & Doc. 33 at 5.) Prompted by the form complaint to "explain what happened at each level," Plaintiff wrote: "I was denied at all levels of my grievances, because they said that SRS is not clinically or medically necessary both at the institutional level and headquarters level gave same reason." (*Id.*) And neither Plaintiff's second nor third amended complaint alleges that the grievance process was unavailable. Therefore, nothing in Plaintiff's complaints overcomes Defendants' evidence that establishes the only relevant grievance was submitted and decided *before* Defendants Buzzini, Chaiken, and Taylor—members of the SMART or GASRC committees— even considered whether GAS surgery was appropriate. Nor does anything in Plaintiff's second or third amended complaint overcome Defendants' evidence that Defendant Mitchell performed the required primary care evaluation but played no role in determining whether Plaintiff was entitled to GAS and that Defendant Neumann neither treated Plaintiff nor played a role in determining whether Plaintiff was entitled to GAS. Plaintiff's assertion that Mitchell had "ultimate authority" over his request for SRS is a legal conclusion and, thus, not a proper ground for finding a genuine dispute of material fact. Further, his belief that Neumann was a member of SMART is erroneous and is not based on Plaintiff's personal knowledge. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586, n.11; *Jones*, 393 F.3d at 923.

In sum, this undersigned concludes that the relevant grievance or appeal did not exhaust Plaintiff's administrative remedies regarding his Eighth Amendment claims against Defendants Buzzini, Chaiken, Mitchell, Neumann, and Taylor. Therefore, Defendants are entitled to summary judgment on that basis.

///

///

**B. Defendants Mitchell, Neumann, Chaiken, Buzzini, and Taylor Were Not Deliberately Indifferent**[3]

Defendants Mitchell and Neumann

Defendants have met their initial burden by producing evidence to demonstrate that Defendant Mitchell played no role in the determination concerning Plaintiff's request for GAS, only performing a required evaluation on July 25, 2019, and that Defendant Neumann played no role in the GAS determination and never treated Plaintiff, thus establishing that neither was deliberately indifferent to Plaintiff's serious medical need. UDF 4, 5; Doc. 96-7 at 2, ¶¶ 5-6 (Neumann Dec.); Doc. 96-8 at 2, ¶¶ 7-8 (Mitchell Dec.). *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) ("Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case") (citing *Celotex*, 477 U.S. at 325); *see* Fed. R. Civ. P. 56(c)(1)(A). Thus, the burden shifts to Plaintiff to establish that a genuine issue of material fact exists concerning these individuals' purported involvement. *Matsushita*, 475 U.S. at 586.

Here, Plaintiff failed to deny UDF 4 or 5. He has also failed to tender affidavits or other admissible discovery material in support of his contention that Defendants Mitchell and Neumann were deliberately indifferent to his serious medical needs by denying his requests for GAS. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11.

Further, a review of Plaintiff's second amended complaints reveals Plaintiff identified Mitchell as the "Chief Medical [Executive]," who "[announced] the [denial] of [his] surgery request" and "upon information and belief" "had ultimate authority over Plaintiff's request for intervention over his [SRS]." (*See* Doc. 20 at 4.) Plaintiff identified Neumann as "Chief of Mental Health" (*id.* at 4) whom Plaintiff believed "to be a member of the SMART committee (*id.* at 7). Further Plaintiff alleged that "as members of the SMART and GASRC these Defendants had

---

[3] The issue before the Court on Defendants' motion for summary judgment concerns the second prong of the deliberate indifference test — a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference. The first prong is not contested. *Cf. Edmo v. Corizon, Inc.*, 935 F.3d 757, 767 (9th Cir. 2019) (recognizing that gender dysphoria may be a serious medical condition and gender confirmation surgery may be necessary to treat prisoners suffering from this condition).

authority to grant or deny Plaintiff's access to gender transition surgeries and are responsible for denying Plaintiff access to medically necessary care in violation of the law upon information and belief." (*Id*. at 7.) Those allegations are not based on Plaintiff's personal knowledge and do not overcome Defendants' evidence that neither Mitchell nor Neumann had a decision making role concerning Plaintiff's request for GAS. *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) ("To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations"); *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (a party may not rely on speculative or conclusory testimony contained within affidavits, pleadings, or moving papers to raise a genuine dispute of material fact in an effort to defeat summary judgment); *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment"); *Coverdell v. Dep't of Soc. & Health Servs.*, 834 F.2d 758, 762 (9th Cir. 1987) (recitations of unsworn factual allegations do not adequately oppose competent evidence presented in a motion for summary judgment); *Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("statements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not facts and likewise will not be considered on a motion for summary judgment" (emphasis omitted)). Neither Neumann nor Mitchell was a member of the GASRC or SMART committees. (Doc. 96-7 at 2, ¶ 5; Doc. 96-8 at 2, ¶ 7.)

Given the foregoing, the undersigned will recommend summary judgment be granted in favor of Defendants Mitchell and Neumann.

<u>Defendants Chaiken, Buzzini and Taylor</u>

Defendants have met their initial burden by establishing the following:

1. Defendants Chaiken, Buzzini, and Taylor were members of the GASRC and/or SMART committees;
2. In 2019, GASRC was required to consider whether known medical or mental health concerns were well-controlled for at least one year, whether any concerns posed a contraindication to surgery, and if the condition was likely to worsen with surgery or

impede recovery;

3. GASRC found Plaintiff's bipolar diagnoses in April 2019, five months prior to receiving his request for GAS, posed a potential contraindication to surgery, and that September 2019 medical records noted Plaintiff "appeared 'manic'" and had refused medications;
4. GASRC found it was possible Plaintiff's mental health conditions would worsen with surgery or impede recovery from surgery;
5. Pursuant to the relevant guidelines, SMART found there was no substantial evidence to reverse GASRC's decision;
6. Defendants Chaiken, Buzzini, and Taylor followed the relevant guidelines in partially approving and partially denying Plaintiff's request for GAS in December 2020 and January 2021. GASRC recommended approving Plaintiff's request for reduction mammoplasty and denying masculinizing bottom surgeries because Plaintiff suffered from chronic kidney disease stage 3 and further evaluation was needed. The risks for each procedure are considered separately, and top surgery carries less risk than bottom surgery;
7. Again, pursuant to the relevant guidelines, SMART found there was no substantial evidence to reverse GASRC's decision;
8. Plaintiff's third request for GAS, submitted on April 20, 2022, was approved in June 2023; on that occasion, Buzzini was the only involved committee member rendering a decision.

UDF 10-18, 22; Doc. 96-4 at 4, ¶ 10 (Buzzini Dec.); Doc. 96-10 at 3, ¶ 8 (Joelson Dec.). Defendants have met their initial burden by producing evidence to demonstrate Defendants Chaiken, Buzzini, and Taylor were not deliberately indifferent to Plaintiff's serious medical needs. *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see* Fed. R. Civ. P. 56(c)(1)(A). Thus, the burden shifts to Plaintiff to establish that a genuine issue of material fact exists. *Matsushita*, 475 U.S. at 586.

Here, Plaintiff failed to deny UDF 10-18 and 22. He has also failed to tender affidavits or

other admissible discovery material in support of his contention that Defendants Chaiken, Buzzini, and Taylor were deliberately indifferent to his serious medical needs by improperly denying his requests for GAS. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11.

A review of Plaintiff's second amended complaints reveals Plaintiff identified Taylor as "Deputy Medical Executive Clinical Operations." (*See* Doc. 20 at 3.) He identified Buzzini as "Sr. Psychologist (SMART)" (*id*. at 3) and Chaiken as "Doctor with (SMART)" (*id*. at 6). Further, Plaintiff alleged that "as members of the SMART and GASRC these Defendants had authority to grant or deny Plaintiff's access to gender transition surgeries and are responsible for denying Plaintiff access to medically necessary care in violation of the law upon information and belief." (*Id*. at 7.) The complaint generally asserts the named Defendants violated Plaintiff's constitutional rights in denying SRS (*id*. at 7-13) and includes a statement that "Plaintiff has all the documents to verify everything that the Plaintiff says is true (*id*. at 13). *Jones,* 393 F.3d at 923; *see Cafasso*, 637 F.3d at 1061; *Soremekun*, 509 F.3d at 984; *Arpin v. Santa Clara Valley Transportation Agency*, 261 F.3d 912, 922 (9th Cir. 2001) (a complaint's conclusory allegations unsupported by specific facts, will not be sufficient to avoid summary judgment); *Nelson*, 83 F.3d at 1081-82; *Coverdell*, 834 F.2d at 762; *Burch*, 433 F. Supp. 2d at 1119. In short, the allegations in Plaintiff's complaint do not overcome Defendants' evidence that Defendants were not deliberately indifferent to Plaintiff's serious medical needs. *See* Fed. R. Civ. P. 56(c) (the opposing party may not rely upon the allegations or denials of their pleadings); *Matsushita*, 475 U.S. at 586 n.11.

In particular, Plaintiff offers nothing to establish a genuine material dispute exists concerning Defendants Chaiken, Buzzini, and Taylor's determinations regarding Plaintiff's requests for GAS because he fails to show their decisions, made according to the relevant GAS guidelines, failed to respond to his medical need or caused him harm. *Farmer*, 511 U.S. at 847; *Wilhelm*, 680 F.3d at 1122. More specifically, Plaintiff offers no evidence to contradict Defendants' evidence that GASRC's recommendation that Plaintiff's August 2019 request for GAS be denied was due to his bipolar diagnosis in April 2019 and manic behavior and refusal of medications in September 2019 as contraindications to surgery or that SMART found there was

no substantial evidence to not support that denial. UDF 14-15. Nor does Plaintiff offer any evidence to contradict Defendants' evidence that his second request, wherein GASRC recommended that mammoplasty be approved but masculinizing bottom surgeries be denied until Plaintiff's mental and mental health conditions were fully assessed and well-controlled for one year, noting Plaintiff suffered from chronic kidney disease stage 3 and continued to demonstrate intermittent mood symptoms and disruptive behavior, and declined medication that might help stabilize his mood, suggesting Plaintiff lacked the ability to adjust medically and psychologically post-surgery, or that SMART found there was no substantial evidence to not support the partial denial. UDF 17-18.

"To show deliberate indifference, the plaintiff must show that the course of treatment the [official] chose was medically unacceptable under the circumstances and that the [official] chose this course in conscious disregard of an excessive risk to the plaintiff's health." *Edmo,* 935 F.3d at 786 (internal quotation marks & citation omitted). Here, there is no evidence in the record to suggest that the denials of Plaintiff's requests in August 2019 and October 2020 were "medically unacceptable under the circumstances" and were done "in conscious disregard of an excessive risk to [his] health." Rather, this record reveals that the GASRC and SMART committees were concerned that Plaintiff's bipolar diagnosis was contraindicated and that his chronic kidney disease and mental health symptoms could affect his ability to adjust after surgery. Therefore, the denials reflect the committees' concerns in light of Plaintiff's particular medical and mental health conditions at the relevant time rather than their conscious disregard of an excessive risk to his health. *Edmo*, 935 F.3d at 786.

For the reasons stated above, the undersigned finds there is no genuine dispute of material fact that Chaiken, Buzzini, and Taylor were deliberately indifferent to Plaintiff's serious medical needs and will therefore recommend summary judgment be granted to Chaiken, Buzzini, and Taylor.

### C. Macomber Did Not Violate the Fourteenth Amendment

Plaintiff argues Defendant Macomber violated his Fourteenth Amendment rights because CDCR's policy requires transgender prisoners seeking GAS for gender dysphoria to undergo a

different and more difficult process than cisgender incarcerated persons and that the regulatory scheme is facially discriminatory against transgender inmates because medically necessary surgeries are unavailable to them whereas cisgender incarcerated persons can receive the same medically necessary procedures.

Defendants maintain that Plaintiff is not similarly situated to cisgender inmates seeking the same surgeries because the inquiry into the medical necessity of the surgeries is different. They assert that a man seeking a mastectomy to treat gender dysphoria must undergo a different medical evaluation than a cisgender woman seeking a mastectomy to treat another condition like cancer. In such instances, the underlying diagnoses precipitating the surgery are different, meaning the transgender and cisgender individuals are not similarly situated.

In support of their position, Defendants rely on CDCR's Guidelines for Review of Gender Affirming Surgery. UDF 11; Doc. 96-10 at 7-14 (Joelson Dec., Ex. A). The guidelines address clinical process, referral and review, and review, including the specific committee review process and final review process. (*Id.*) Defendants present evidence that the decisions made concerning Plaintiff's GAS requests complied with CDCR policy and were based on Plaintiff's unique conditions and requests as then presented. UDF 14-15, 17-18; *see* UDF 21-22, 26.

The Equal Protection Clause of the Fourteenth Amendment requires that persons who are similarly situated be treated alike. *City of Cleburne,* 473 U.S. at 439; *Hartmann*, 707 F.3d at 1123. To state a claim, a plaintiff must show that defendants intentionally discriminated against him based on his membership in a protected class. *Id.*; *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) (same). Prisoners are not a protected class but the Equal Protection Clause does protect prisoners from intentional discrimination based on gender identity. *Harrison v. Kernan*, 971 F.3d 1069, 1079-80 (9th Cir. 2020) (adopting intermediate scrutiny in gender-based prison cases); *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019) (holding that the level of scrutiny applicable to discrimination based on transgender status is "more than rational basis but less than strict scrutiny").

Here, Defendants have met their initial burden by producing evidence to demonstrate Defendants did not intentionally discriminate against Plaintiff based on his membership in a

protected class, as a transgender male, or alternatively, as an inmate with GD seeking SRS. *Hartmann*, 707 F.3d at 1123; *Furnace*, 705 F.3d at 1030; *see, e.g., Gordon v. Inslee*, No. 21-5802-BJR-DWC, 2023 WL 2864187, at *3 (W.D. Wash. Apr. 10, 2023) (adopting recommendation to grant summary judgment on plaintiff's equal protection claim where no evidence established "that any of Defendants' actions were taken 'with an intent or purpose to discriminate against the plaintiff *based upon membership in a protected class*' as a transgender female") (emphasis in original). And the Court finds Defendants followed CDCR's policy — Guidelines for Review of Gender Affirming Surgery — which involves permissible discretionary decision-making based upon individualized assessments. *See* Doc. 96-10 at 8 ("The Committee shall determine whether the patient is an appropriate candidate for Surgery from a medical and mental health perspective, following consideration of the applicable factors set forth in section 5 below and report their recommendation to SMART"); *id.* at 9 (11 considerations "shall be considered by the Committee regarding whether or not Surgery will be recommended"); *id.* at 10 ("For each case submitted by the Committee under these Guidelines to SMART …"). *See Gordon v. Inslee*, No. 21-5802-BJR-DWC, 2023 WL 2874062, at *9 (W.D. Wash. Feb. 6, 2023) (recommending granting summary judgment on plaintiff's equal protection claim; reasoning "Plaintiff has submitted no evidence showing a discriminatory motive for [] the alleged delay in scheduling her GCS procedure … On the contrary, with respect to plaintiff's medical claims, defendants have submitted evidence they followed their established medical protocols in considering plaintiff for GCS"), *R&R adopted by* 2023 WL 2864187, at *3 (noting, in contrast to the absence of evidence showing discriminatory motive, that defendants "submitted evidence supporting plausible, constitutionally permissible explanations for their actions" in scheduling plaintiff's GCS procedure). Therefore, the undersigned finds Defendants have met their initial burden by producing evidence to demonstrate the policy at issue does not violate the Equal Protection Clause. Fed. R. Civ. P. 56(c)(1)(A); *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325). Thus, the burden shifts to Plaintiff to establish that a genuine issue of material fact exists. *Matsushita*, 475 U.S. at 586.

Here, Plaintiff failed to deny UDF 11, 14-15, 17-18, 21-22, or 26. He has also failed to

tender affidavits or other admissible discovery material in support of his contention that transgender prisoners seeking GAS for gender dysphoria must undergo a more difficult process than cisgender incarcerated persons or the regulations are discriminatory against transgender inmates because medically necessary surgeries are unavailable to them whereas cisgender incarcerated persons can receive the same medically necessary procedures. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11.

In his second amended complaint, Plaintiff generally alleges that Defendants "applied the [regulation] in a manner that discriminated against Plaintiff on the basis of his gender and transgender status, in considering Plaintiff's need for SRS" and "failed to give proper consideration to specific circumstances of Plaintiff's gender dysphoria and need for SRS …." (Doc. 20 at 4-5, 15-16.) But, as before, Plaintiff's allegations are not based on Plaintiff's personal knowledge and do not overcome Defendants' evidence otherwise. *Cafasso*, 637 F.3d at 1061; *Soremekun*, 509 F.3d at 984; *Nelson*, 83 F.3d at 1081-82; *Coverdell,* 834 F.2d at 762; *Burch,* 433 F. Supp. 2d at 1119.

In sum, because there is an absence of evidence that Plaintiff was treated differently from those similarly situated with regard to GAS, Defendant Macomber is entitled to summary judgment. *See* Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11.

**D. The Section 3350.1(c) Argument Is Moot**

"Federal courts lack jurisdiction to consider moot questions . . . or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006) (internal quotation marks & citations omitted). An action or "claim is moot if it has lost its character as a present, live controversy." *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997) (citation omitted). "If an event occurs that prevents the court from granting effective relief, the claim is moot and must be dismissed." *Id.* (citation omitted). "The party asserting mootness bears the burden of establishing that there is no effective relief remaining that the court could provide." *S. Oregon Barter Fair v. Jackson Cty., Oregon*, 372 F.3d 1128, 1134 (9th Cir. 2004) (citation omitted). "That burden is 'heavy'; a case is not moot where any effective relief may be granted." *Forest Guardians*, 450

F.3d at 461 (citation omitted).

"Mootness inquiries . . . require courts to look to changing circumstances that arise after the complaint is filed." *Clark v. City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001) (citation omitted). "A case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. The underlying concern is that, when the challenged conduct ceases such that there is no reasonable expectation that the wrong will be repeated, then it becomes impossible for the court to grant any effectual relief whatever to the prevailing party. In that case, any opinion as to the legality of the challenged action would be advisory." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (citations, internal punctuation & quotation marks omitted).

"When plaintiff filed her FAC, former Section 3350.1 identified vaginoplasty as a surgery 'that is not medically or clinically necessary [and] shall not be provided,' except to correct cystocele or rectocele in cisgender women. … However, on July 18, 2018, after plaintiff filed her FAC, CDCR enacted emergency regulations amending Section 3350.1 to, inter alia, remove vaginoplasty from the "not medically necessary" list. ... This change conformed CDCR regulations to CCHCS's gender dysphoria treatment guidelines which expressly authorize male to female vaginoplasty for transgender women when medically indicated." *McQueen v. Brown*, No. 2:15-cv-2544 JAM AC P, 2019 WL 949442 at *8 (E.D. Cal. Feb. 27, 2019). In that case, the Court found McQueen's equal protection claim was "premised on former Section 3350.1" and recommended the claim be dismissed as moot on that basis. *Id*. The recommendation was adopted. *See McQueen v. Brown*, 2019 WL 2491271 (E.D. Cal. June 14, 2019).

Like *McQueen*, before Plaintiff filed his original complaint on January 16, 2020, CDCR enacted emergency regulations amending Section 3350.1 to remove vaginoplasty, inter alia, from the "not medically necessary" list. Section 3350.1 was then renumbered to change without regulatory effect renumbering former section 3350.1 to new subsections 3999.200(b)-(d) filed 8-6-2018 pursuant to section 100, title 1, California Code of Regulations (Register 2018, No. 32). Thus, circumstances surrounding the statute at issue changed. *Clark*, 259 F.3d at 1006. Therefore, to the extent Plaintiff relies on former section 3350.1, there is no longer a live controversy at issue

and any finding concerning its legality would be advisory. *City of Erie*, 529 U.S.at 287; *Am. Rivers*, 126 F.3d at 1123.

**E. Qualified Immunity**

Because the Court has determined Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment deliberate indifference to serious medical needs and Fourteenth Amendment equal protection claims, the undersigned declines to address Defendants' qualified immunity defense. *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all").

**VIII. CONCLUSION AND RECOMMENDATION**

For the reasons given above, the undersigned **HEREBY RECOMMENDS** that Defendants' motion for summary judgment (Doc. 96) be **GRANTED** and that judgment be entered in their favor.

These Findings and Recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). **Within 21 days** after being served with a copy of these Findings and Recommendations, a party may file written objections with the Court. Local Rule 304(b). The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed 15 pages without leave of Court and good cause shown. The Court will not consider exhibits attached to the Objections. To the extent a party wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity. Any pages filed in excess of the 15-page limitation may be disregarded by the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. § 636(b)(l)(C).

///

///

///

///

A party's failure to file any objections within the specified time may result in the waiver of certain rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

IT IS SO ORDERED.

Dated: **November 5, 2026**

UNITED STATES MAGISTRATE JUDGE